# EXHIBIT A

Case 1:15-cv-04297   Document 1-2   Filed 07/22/15   Page 2 of 45 PageID #: 15

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-------------------------------------------------------------------x

ALEXANDER MARCHAK, HOLLY MARCHAK,
ALEX MARCHAK,
CONNIE BOCCIA, FRANK BOCCIA,
MARGOT BOCCIA, BRIAN MARCHESE,
LIDIA OHRYN, MARIKA OHRYN, PETER OHRYN,
OHRYN FAMILY TRUST, JOSEPH RUDIS,
IRENE RUDIS, LOIS SARLI-KREBS,
LISA CAPRARA SECH, ANTHONY SECH,
MYRON SECH, LEONARD MANDATO,
EDWARD MAHONEY, TARA MAHONEY,
GREGORY TARAZZI, FREDERICK TARAZZI,
GEORGE TARAZZI, KATHLEEN TARAZZI,
ANDREA CHIARAPPA, YOLANDA CHIARAPPA,
DOREEN DALY, FRANCIS DALY, LORRAINE DALY,

|  |  |
|---|---|
| E-Filing Case | |
| INDEX NO. | |
| Plaintiffs designate KINGS County as the place of trial | |
| **SUMMONS** | |
| The basis of venue is the residences of many of the plaintiffs | |

*Plaintiffs,*

-against-

JPMORGAN CHASE & CO.,
JPMORGAN CHASE BANK, N.A.,
M&T BANK CORPORATION,
HSBC NORTH AMERICA INC., d/b/a
HSBC BANK USA, N.A.,
and TD BANK, N.A.,
AS SUCCESSOR IN INTEREST TO COMMERCE BANK,

*Defendants.*

-------------------------------------------------------------------x

To the above-named Defendants:

**You are hereby summoned** to answer the Verified Complaint in this action and to

serve a copy of your answer or, if the Verified Complaint is not served with this Summons, to

serve a Notice of Appearance, on the Plaintiffs' Attorneys within 20 days after the service of this

Summons, exclusive of the day of service (or within thirty (30) days after the service is complete

if this Summons is not personally delivered to you within the State of New York); and in the case

of your failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the Verified Complaint.

Dated: New York, New York
      June 2, 2015

                                    Kahn Gordon Timko & Rodriques, P.C.

                                    By: Nicholas I. Timko Esq.
                                    *Attorney for Plaintiffs*
                                    20 Vesey Street - Suite 300
                                    New York, New York 10007
                                    (212) 233-2040

Defendants' Addresses:

1.     JPMorgan Chase & Co. -270 Park Avenue (38th Floor), New York, New York 10017
2.     JPMorgan Chase Bank, N.A. -270 Park Avenue (38th Floor), New York, N.Y. 10017
3.     M&T Bank Corporation - One M&T Plaza, Buffalo, New York 14203
4.     HSBC North America, Inc., d/b/a HSBC Bank USA, N.A. - One HSBC Center, Buffalo, N.Y. 14203
5.     TD Bank, N.A. - 1701 Route 70 East, Cherry Hill, New Jersey 08034

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-------------------------------------------------------------------------x

ALEXANDER MARCHAK, HOLLY MARCHAK,      E-Filing Case
ALEX MARCHAK,
CONNIE BOCCIA, FRANK BOCCIA,
MARGOT BOCCIA, BRIAN MARCHESE,      INDEX NO.
LIDIA OHRYN, MARIKA OHRYN, PETER OHRYN,
OHRYN FAMILY TRUST, JOSEPH RUDIS,
IRENE RUDIS, LOIS SARLI-KREBS,      **VERIFIED COMPLAINT**
LISA CAPRARA SECH, ANTHONY SECH,
MYRON SECH, LEONARD MANDATO,
EDWARD MAHONEY, TARA MAHONEY,
GREGORY TARAZZI, FREDERICK TARAZZI,
GEORGE TARAZZI, KATHLEEN TARAZZI,
ANDREA CHIARAPPA, YOLANDA CHIARAPPA,
DOREEN DALY, FRANCIS DALY, LORRAINE DALY,

*Plaintiffs,*

-against-

JPMORGAN CHASE & CO.,
JPMORGAN CHASE BANK, N.A.,
M&T BANK CORPORATION,
HSBC NORTH AMERICA INC., d/b/a
HSBC BANK USA, N.A.,
and TD BANK, N.A.,
AS SUCCESSOR IN INTEREST TO COMMERCE BANK,

*Defendants.*

-------------------------------------------------------------------------x

    Plaintiffs, by their attorneys Kahn Gordon Timko & Rodriques, P.C., as and for their

Verified Complaint against defendants, allege as follows:

## INTRODUCTION

    1.    These actions concern the repeated and egregious conduct of financial

institutions that facilitated and enabled a substantial financial fraud that was being conducted

- 1 -

with their knowledge, but chose to turn a blind eye to it and were, therefore, thoroughly complicit in it. But there is more to this story than banks who knew or should have known of the fraud. Each of the banks had before it the very nuts and bolts of a Ponzi scheme: money deposited by each bank's customer into each account to purportedly buy and sell securities - money that was obtained by that customer from hundreds of innocent investors - was not used to buy and sell securities, but instead was merely transferred by the customer into his own coffers or to redeem investments in patterns that I could serve no legitimate business purpose.

2.     We have a rule in our society -banks have a duty, pursuant to Federal and State legislation and regulations, to know their customers and to monitor their customers' account activity. The reason for this rule could not be more simple. If the public is to have any faith or confidence in the banks and the banking system, the banks must ensure that their depositors are not misusing the financial system to commit criminal acts.

3.     Federal legislation and regulations have long required banks to have an Anti Money Laundering program ("AML"). One element of these programs is monitoring customer account activity in order to detect possible fraud, money laundering, or other improper activity. These requirements were first imposed by the Bank Secrecy Act of 1970 ("BSA") and federal banking regulations. 31 U.S.C. §5311; 12 C.F.R. §208.63. All of the federal banking agencies have substantially identical requirements. Thus, banks such as those being sued herein, under the supervision of the Office of the Comptroller of the Currency ("OCC") would have the same obligations. The Patriot Act, enacted into law in 2001, reinforced these obligations and underscored the importance of implementing robust detection systems to ensure that money launderers and terrorists would not be able to use the United States financial system to further their crimes.

- 2 -

4.      One purpose of these requirements is to ensure that banks, which are often in the best position to identify potential illegal activity, will closely observe the transactions taking place in their clients' accounts. The legislation and regulations also provide guidance to banks and other financial institutions regarding how to best achieve that goal and what actions to take once suspicious activity is identified.

5.      Section 352 of the Patriot Act and the banking regulations require financial institutions to institute an AML program that includes four elements: (1) designation of an individual or individuals responsible for managing BSA compliance; (2) a system of policies, procedures and internal controls to ensure ongoing compliance; (3) training for appropriate personnel; and (4) independent testing of compliance.  12 C.F.R. §208.63.

6.      Financial institutions must also fully understand the business in which their customers are engaged. This duty, referred to as the responsibility to "know your customer" ("KYC"), is critical to determining what activity is suspicious (12 C.F.R. §208.62). Institutions viewing account activity need a baseline against which to distinguish account activity that may be normal for a particular industry from account activity that might suggest an illegal enterprise. The KYC duty also pre-dated the Patriot Act. Not only was it suggested by such guidelines as the Federal Reserve's BSA Examination Manual of 1995 and Supervisory Letter on Private Banking Activities, SR-97-19 (SUP), but it was standard industry practice.

7.      This regulatory guidance directed banks, including the defendants herein, to perform site visits to their clients, obtain and review financial statements to corroborate the sources of the clients' wealth, and to review media reports regarding their clients.

8.     It was also standard industry practice for financial institutions to perform KYC on their clients. Many financial institutions have entire departments devoted to this one task and to making sure that KYC is performed thoroughly and is constantly monitored and recorded.

9.     Upon information and belief, each of the defendant banks herein had KYC departments at all times that their customer who orchestrated and carried out the Ponzi scheme maintained and operated accounts at each of those banks.

10.     While each of the defendants may have created AML and KYC programs that facially met the requirements of the Patriot Act and related regulations, those programs were not effectively executed and either failed to discover the suspicious and fraudulent nature of the customer's business, or simply chose to bury their heads in the sand as to same.

11.     Moreover, if their customer's large transactions that did not jibe with any legitimate business purpose triggered any warnings, each of the defendant banks suppressed those warnings as the drive for fees and profits became a substitute for common sense, ethics and legal obligations.

## THE PARTIES

12.     Plaintiffs Alexander Marchak, Holly Marchak and Alex Marchak are natural persons and husband, wife, and son, and reside at 10 Barrister Drive, Holmdel, New Jersey.

13.     Plaintiffs Connie Boccia and Frank Boccia are natural persons and husband and wife at reside at 1843 Gerritsen Avenue, Brooklyn, New York.

14.     Plaintiff Margot Boccia is a natural person who resides at 1843 Gerritsen Avenue, Brooklyn, New York.

15.      Plaintiffs Andrea Chiarappa and Yolanda Chiarappa are natural persons and husband and wife and reside at 12A Sycamore Avenue, Bethpage, New York.

- 4 -

16. Plaintiff Doreen Daly is a natural person who resides at 2102 South Lehigh Ave, Apt 1RR, Whitehall, PA.

17. Plaintiff Francis Daly is a natural person who resides at 6 Vecchio Road, Manchester, NJ.

18. Plaintiff Lorraine Daly is a natural person who resides at 6 Vecchio Road, Manchester, NJ.

19. Plaintiffs Edward Mahoney and Tara Mahoney are natural persons and husband and wife and reside at 323 Retford Avenue, Staten Island, New York.

20. Plaintiff Leonard Mandato is a natural person who resides at 383 Hempstead Avenue, Rockville Center, New York.

21. Plaintiff Brian Marchese is a natural person who resides at 2899 Fountainhead Drive, San Ramon, CA.

22. Plaintiff Lidia Ohryn is a natural person who resides at 442 53rd Street, Brooklyn, New York.

23. Plaintiff Marika Ohryn is a natural person who resides at 442 53rd Street, Brooklyn, New York.

24. Plaintiff Peter Ohryn is a natural person who resides at 442 53rd Street, Brooklyn, New York.

25. Plaintiff Ohryn Family Trust, by Marika Ohryn Trustee, is a New York trust with an address at 442 53rd Street, Brooklyn, New York.

26. Plaintiffs Joseph Rudis and Irene Rudis are natural persons and husband and wife and reside at 642 51st Street, Brooklyn, New York.

27. Plaintiff Lois Sarli-Krebs is a natural person who resides at 23298 Barlake Drive, Building R, Boca Raton, FL.

28. Plaintiff Myron Sech is a natural person who resides at 18 Northgate Drive, Greenlawn, New York.

29. Plaintiff Lisa Caprara Sech is a natural person who resides at 18 Northgate Drive, Greenlawn, New York.

30. Plaintiff Anthony Sech, by his mother and natural guardian Lisa Caprara Sech, is a natural person who resides at 18 Northgate Drive, Greenlawn, New York.

31. Plaintiff Frederick Tarrazi is a natural person who resides at 291 Retford Ave, Staten Island, NY.

32. Plaintiff Gregory Tarrazi is a natural person who resides at 4 Janine Place, Hazlet, New Jersey.

33. Plaintiffs George Tarrazi and Kathleen Tarrazi are natural persons who reside at 225 South Peninsula Drive, Central City, Pennsylvania.

34. Upon information and belief, defendant JPMorgan Chase & Co. was and still is a corporation organized and existing under and by virtue of the laws of the Delaware that is authorized to do business in the State of New York with a principal executive office at 270 Park Avenue (38th Floor), New York, New York and is the parent of defendant JPMorgan Chase Bank, N.A. ("Chase").

35. Upon information and belief, Chase is a national banking association in the United States with locations in 23 states, including a location in Brooklyn, New York.

36. Upon information and belief, prior to November 2004, JPMorgan Chase was a New York State chartered bank, regulated by the New York State Banking Department.

37.    Upon information and belief, on or about July 9, 2004, JPMorgan Chase requested approval to convert to a national banking association and the request was granted by the Comptroller of the Currency on or about October 13, 2004, upon which the bank's name was changed to JPMorgan Chase Bank, N.A.

38.    Defendant M&T Bank Corporation ("M&T") was and still is a corporation organized and existing under and by virtue of the law of the State of New York with a principal executive office at One M&T Plaza, Buffalo, New York.

39.    Upon information and belief, M&T has locations in 8 states, including a location in Brooklyn, New York.

40.    Upon information and belief, M&T is regulated by and subject to the regulations of, among others, the Federal Reserve and the Comptroller of the Currency.

41.    Defendant HSBC North America Inc. was and still is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware with a principal executive office at One HSBC Center, Buffalo, New York.

42.    Defendant HSBC North America Inc. is authorized to conduct and conducts business in the State of New York.

43.    Upon information and belief, defendant HSBC North America Inc. does business as HSBC Bank USA, N.A. ("HSBC").

44.    Upon information and belief, defendant HSBC was and still is organized and existing under and by virtue of the laws of the United States of America with its principal place of business at One HSBC Center, Buffalo, New York.

45.    Upon information and belief, HSBC is a national banking association in the United States with locations in 13 states, including a location in Brooklyn, New York.

46.     Upon information and belief, defendant TD Bank, N.A. was and still is organized and existing under and by virtue of the laws of the United States of America with its principal place of business at 1701 Route 70 East, Cherry Hill, New Jersey.

47.     Upon information and belief, TD Bank, N.A. ("TD") is a national banking association in the United States with locations in 16 states, including a location in Brooklyn, New York.

48.     Upon information and belief, on or about March 31, 2008 TD acquired the assets and liabilities of Commerce Bank.

## THE FACTS

49.     This action concerns the enabling and facilitation by each of the defendants of a multi-million dollar Ponzi scheme orchestrated by Philip Barry and conducted through several entities the Barry controlled: Leverage Group; Leverage Option Management Co., Inc.; and North American Financial Services (collectively "Leverage"). From January 1978 through at least February 2009, with the willing participation of each of the defendants, Barry conned hundreds of investors into investing over $40 million in the Leverage investment funds by promising high, but false, rates of investment returns with guaranteed safety of principal and making numerous other misrepresentations. Instead of delivering on these promises, each of the defendants facilitated, enabled and abetted Barry's misappropriation of millions of dollars for his personal use, including funding his own speculative real estate ventures. Ultimately, while each of the defendants chose to do nothing about it, Barry and Leverage misappropriated and dissipated millions of dollars of investor funds and concealed these losses from investors.

50.     Barry, operating through Leverage, made a number of misrepresentations to induce investors to invest in or to maintain their investments with Leverage. For example, Barry

- 8 -

falsely represented that he would use the investors' funds to trade in options or other securities. Barry claimed that he would employ a proven trading strategy to protect investors' principal and generate a guaranteed rate of return, which he arbitrarily determined to be 12.55 percent per year. Barry also claimed to some investors that their investment in leverage would be protected from loss by private insurance and/or by the Securities Investors Protection Corporation ("SIPC"). Barry further told investors that so long as investors provided a few weeks notice, they could liquidate their investment and withdraw their funds at any time.

51.     When investors expressed interest in withdrawing from their accounts, Barry would first discourage such withdrawals. If investors nonetheless insisted on making withdrawals, Barry would not comply with the requests in a timely fashion, and would make excuses for not doing so. Once Barry issued a withdrawal check, he often instructed investors to wait a period of time before depositing or cashing the check. Even when investors followed Barry's instructions, the checks would often be returned due to insufficient funds.

52.     Contrary to Barry's representations that he would trade securities for the benefit of Leverage investors, he did no securities trading at all for several years. Instead, Barry systematically misappropriated and misused millions of dollars of investor funds. Among other things, Barry secretly used investor funds to purchase real property, which he titled in his own name or the names of entities he owned or controlled and frequently used as collateral for loans. He also diverted some of the investor money to support a business he owned that was knows as Barry Publications.

53.     Barry through Leverage routinely fabricated quarterly statements for investors that reported lofty investment performance. Barry disseminated these phony account

statements as recently as November 2008, m an effort to conceal from Leverage investors that he had misappropriated their funds.

54.     Barry, through Leverage, and facilitated, enabled and abetted by each of the defendants, operated a Ponzi scheme to complete the illusion that he was delivering the investment returns he promised to Leverage investors. He routinely paid, with the knowledge and acquiescence of each of the defendants, phony investment returns not from investment profits, but from funds obtained from other Leverage investors or by secretly returning to the investors some of their own money.

55.     In order to run his Ponzi scheme, Barry needed a bank account to provide his investors with a sense that he was operating a legitimate investment business. Having a bank account would allow Barry to receive investors' funds and then transfer those funds out of the account to perpetuate the Ponzi scheme.

56.     Barry/Leverage opened accounts at defendants Chase, M&T, TD (Commerce) and HSBC.

57.     None of the bank accounts opened by Barry/Leverage looked like a normal broker- dealer account. Each of the defendants knew that investors' funds were being deposited, but did not require same to be segregated or transferred to separate sub-accounts.

58.     Activity in the accounts opened by Barry/Leverage at each defendant's bank did not show large outflows of funds to purchase securities or large inflows when the securities were sold.

59.     Instead, each of the accounts showed highly suspicious activity including, but not limited to:  large numbers of checks were returned for insufficient funds, large dollar transactions were being conducted by check, and large cash withdrawals were routinely made.

60.     Between 2004 and 2009, the defendants collectively permitted Barry through Leverage to bounce approximately 1,623 checks written on defendants Chase, TD (Commerce), M&T and HSBC and incur overdraft fees of approximately $46,191.00.

61.     Upon information and belief, for the period from December 12, 2003 to December 5, 2007, Barry/Leverage deposited approximately $23,092,253.85 with defendant Chase and withdrew $23,115,287.23.

62.     Upon information and belief, for the period from June 20, 2007 through December 19, 2007, Barry/Leverage deposited approximately $894,755.76 with defendant TD (Commerce) and withdrew $894,755.76.

63.     Upon information and belief, for the period from December 20, 2007 through September 2, 2008, Barry/Leverage deposited approximately $2,592,178.29 at defendant M&T and withdrew $2,592,178.29.

64.     Upon information and belief, for the period from January 10, 2008 through January 16, 2009, Barry/Leverage deposited approximately $131,006.88 with defendant HSBC and withdrew $130,554.87.

65.     Upon information and belief, the unusual activities that were conducted in the bank accounts were visible to defendants who had to approve and negotiate the large dollar transactions. Such activities required further investigation under relevant law and prudent business practices.

66.     The unusual activities should have triggered investigation not only by the banker in charge of each of the accounts, but should also have triggered each bank's AML monitoring system. Long before the passage of the USA Patriot Act in 2001 ("Patriot Act") and with greater force after Congress passed said Act, banks such as defendants were required to

monitor their customers' transactions to detect and prevent money laundering and other suspicious activities. The Patriot Act reinforced this obligation and underscored the importance of implementing robust detection systems.

67. What Barry/Leverage needed was a bank or banks that would be willing to look the other way and would ignore the anomalous account activity as well as notifications from their AML monitoring system.

68. Barry/Leverage found those banks. Each of the defendants ignored years of suspicious and inexplicable activity in the Barry/Leverage accounts. In return, each of the defendants earned revenues from their relationships with Barry/Leverage. Each of the defendants made money and Barry/Leverage made money. The instant Plaintiffs lost money, some of them their life savings or retirement funds.

### DEFENDANTS HAD A DUTY TO KNOW THEIR CUSTOMER AND TO MONITOR THEIR CUSTOMER'S ACCOUNT ACTIVITY

#### A. DEFENDANTS HAD A DUTY TO KNOW WHAT BUSINESS BARRY/LEVERAGE WAS OPERATING

69. The first step in identifying suspicious activity is for a bank to determine what its client's normal business activity would look like. Federal financial Institution Examination Manual of June 2005. This step can be accomplished in many ways, including by meeting with the client and learning about the client's business, conducting on-site due diligence visits to review the client's business operations and reviewing the client's financial statements.

70. Upon information and belief, at the time of the occurrences set forth herein, each of the defendants designated a person to be in charge of ensuring each that bank had sufficient information regarding Barry/Leverage and its business, but either each such person was

incompetent and failed to discover the suspicious and fraudulent nature of the Barry/Leverage and the business or simply chose to ignore what was discovered.

### B.   DEFENDANTS HAD A DUTY TO INVESTIGATE THE BARRY/LEVERAGE ACCOUNT ACTIVITY WHICH WAS FACIALLY INCONSISTENT WITH ANY LEGITIMATE PURPOSE

71.     Not only did defendants fail to "know" Barry/Leverage, but they also failed to investigate activity that was suspicious regardless of whether defendants thought Barry/Leverage were using the bank accounts to operate an investment advisory business or a market making business or any other legitimate purpose.

72.     Upon information and belief, defendants knew that the transaction activity in the Barry/Leverage accounts could not have been linked to a legitimate business purpose and this fact should have been flagged by each defendant's personnel and its automated monitoring system.

73.     Upon information and belief, defendants knew that Barry/Leverage was purporting to operate an investment advisory business.  If Barry/Leverage had been using the accounts for that business, defendants would have seen millions of dollars leaving the accounts and going to purchase securities and corresponding million-dollar inflows into the accounts as Barry/Leverage sold the securities.

74.     Instead, what defendants saw was massive outflows of money that were in no way linked to customer accounts or stock and options trading.  Money would come into each bank as clients invested additional funds with Barry/Leverage.  An overwhelming majority of funds would then go directly back out to clients in the form of redemption.  Any balance that remained was used by Barry/Leverage for speculative real estate ventures and to fund personal expenses and other Barry enterprises.

- 13 -

75.     Defendants also faced regular account activity that would have been suspicious regardless of the type of business Barry/Leverage was running. The 2000 OCC BSA/AML Handbook identified numerous "red flags" that financial institutions need to consider as part of their transaction monitoring procedures.  They included (1) unexplained repetitive or unusual patterns of activity; (b) frequent large dollar transactions without corresponding explanations as to how those funds would be utilized; and (3) spikes in customer activity with little or no explanation. Each of the Barry/Leverage accounts exhibited all of these types of transactions, and exhibited them repeatedly. The amount of bounced checks, alone, should have brought more scrutiny on the Barry/Leverage accounts by the defendants. So, too, the fact that most of the activity in each of the accounts were conducted by checks in and out of the accounts.

### C.     DEFENDANTS HAD A DUTY TO INVESTIGATE SUSPICIOUS ACTIVITY IN THE BARRY/LEVERAGE ACCOUNTS

76.     Once suspicious activity is identified, a bank must further investigate to determine whether there could be a legitimate explanation for the activity or, rather, if it is indicative of illegal activity.

77.     Upon information and belief, in the face of repeated indications of suspicious transaction activity in the Barry/Leverage accounts, defendants never conducted any diligent investigation in the Barry/Leverage accounts or filed a Suspicious Activity Report ("SAR") with the United States government.

### D.     DEFENDANTS HAD A DUTY TO TAKE ACTION

78.     Knowing that the activity in the Barry/Leverage accounts was not consistent with the purported business purpose of the accounts, and faced with evidence that illegal activity was occurring, each of the defendants had a duty to take action, not to participate in a breach of fiduciary duty, and to prevent the further diversion of fiduciary assets. At the very

least, each of the defendants should have questioned Barry/Leverage and when each failed to receive a credible explanation for the bizarre activity, closed the account.

79.     Instead, each of the defendants took no action. Upon information and belief, each of the defendants did not convey their concerns to authorities or regulators in 2008 or before.

80.     Each of the defendants willingly turned a blind eye to indicia of fraud at Barry/Leverage based upon information available to them. Instead, each of the defendants continued to do business with Barry/Leverage and allowed the accounts to operate without restrictions.

### THE PLAINTIFFS' CLAIMS

81.     Upon information and belief, Plaintiffs Alexander Marchak and Holly Marchak deposited the following amounts with Barry/Leverage on or about the following dates:

1990s - $170,000
3/9/06 - $ 2,153,146.50
2007 - $36,200.97
        $ 2,359,347.47

82.     Upon information and belief, Plaintiffs Alexander Marchak and Holly Marchak incurred additional expenses in the amount of $125,304.86.

83.     Upon information and belief, Plaintiffs Alexander Marchak and Holly Marchak made withdrawals in the total amount of approximately $286,200.00 from 1990 through 2007.

84.     Upon information and belief, Plaintiffs Alexander Marchak and Holly Marchak have been damaged in the amount of $2,198,452.33, plus interest thereon and the costs and disbursements of this action.

85.     Upon information and belief, Plaintiff Alex Marchak has been damaged in the amount of $36,200.97 in the year of 2007, plus interest thereon and the costs and disbursements of this action.

86.     Upon information and belief, Plaintiffs Connie Boccia and Frank Boccia made deposits with Barry/Leverage commencing in or about January 2001 into Account No. 1-0410-01. Plaintiffs Connie Boccia and Frank Boccia made deposits with Barry/Leverage commencing in or about July 2006 into Account No. 7-211-06B in amounts to be proven upon the trial of this action, but at least $340,000.00.

87.     Upon information and belief, Plaintiffs Connie Boccia and Frank Boccia made additional deposits over the years and they have been damaged in an amount to be determined upon the trial of this action, but at least $340,000.00, plus interest thereon and the costs and disbursements of this action.

88.     Upon information and belief, Plaintiff Margot Boccia made deposits with Barry/Leverage commencing in or about September, 2002 into Account No. 9-121-02 and in or about November, 2005 into Account No. 11-231-05 and in or about December, 2006 into Account No. 12-101-06B in amounts to be proven upon the trial of this action.  Subsequent deposits were made into the accounts and Plaintiff Margot Boccia has been damaged, in an amount to be determined upon the trial of this action, but at least $100,000.00, plus interest thereon and the costs and disbursements of this action.

89.     Upon information and belief, Plaintiff Andrea Chiarappa made the following deposits with Barry/Leverage on or about the following dates:

> 02/25/2003 – $ 6,000
> 04/24/2003 – $ 60,000
> 11/03/2003 – $ 45,850.42

- 16 -

$$
\begin{array}{l}
\text{11/12/2003} - \$ 30,000 \\
\text{02/03/2005} - \$ 5,000 \\
\text{04/01/2005} - \underline{\$ 25,000} \\
\phantom{xxxxxxxxx} \$171,850.42
\end{array}
$$

90.      Upon information and belief, between December 31, 2003 and June 30, 2008, Plaintiff Andrea Chiarappa made withdrawals in the amount of $160,000.00 and he has been damaged in the amount of $21,850.42, plus interest thereon and the costs and disbursements of this action.

91.      Upon information and belief, Plaintiff Yolanda Chiarappa deposited $6,000.00 with Barry/Leverage on or about February 19, 2003 and an additional $12,487.17 on or about April 24, 2003. On or about January 3, 2006, she withdrew $10,000.00 and she has been damaged in the amount of $8,487.17, plus interest thereon and the costs and disbursements of this action.

92.      Upon information and belief, Plaintiff Doreen Daly deposited $3,000.00 with Barry/Leverage on or about February 1, 2007. She made no withdrawals and has been damaged in the amount of $3,000.00, plus interest thereon and the costs and disbursements of this action.

93.      Upon information and belief, Plaintiff Francis Daly made the following Deposits with Barry/Leverage on or about the following dates:

$$
\begin{array}{l}
\text{2/28/03} - \ \ \$42,000 \\
\text{6/13/03} - \ \ \$ 500 \\
\text{10/11/03} - \$10,000 \\
\text{4/29/04} - \underline{\$ \ 7,000} \\
\phantom{xxxxxxxx} \$59,500
\end{array}
$$

94.      Upon information and belief, between December 31, 2006 and December 31, 2008, Plaintiff Francis Daly withdrew $9,000.00 and he has been damaged in the amount of $50,500.00, plus interest thereon and the costs and disbursements of this action.

95.      Upon information and belief, Plaintiff Lorraine Daly made the following

- 17 -

deposits with Barry/Leverage on or about the following dates:

> 4/25/03- $10,000
> 6/1/07 - $ 3,000
> 6/9/08 - $62,000
>            $75,000

96.     Upon information and belief, on or about January 22, 2004, Plaintiff Lorraine Daly withdrew $5,000.000 and she has been damaged in the amount of $70,000.00, plus interest thereon and the costs and disbursements of this action.

97.     Upon information and belief, Plaintiffs Edward Mahoney and Tara Mahoney deposited $50,000.00 with Barry/Leverage on or about August 13, 2005. Between November 7, 2006 and January 23, 2008, they withdrew the total amount of $38,062.18 and have been damaged in the amount of $11,937.82, plus interest thereon and the costs and disbursements of this action.

98.     Upon information and belief, Plaintiff Leonard Mandato deposited the following amounts with Barry/Leverage on or about the following dates:

> 6/28/05 – $50,000
> 2/20/06 – $15,000
> 12/20/06 – $ 2,000
>            $67,000

99.     Upon information and belief, between January 2008 and March, 2008, Plaintiff Leonard Mandato withdrew the total amount of $26,000 and he has been damaged in the amount of $39,000.00, plus interest thereon and the costs and disbursements of this action.

100.    Upon information and belief, Plaintiff Leonard Mandato received Check No. 2285, dated July 7, 2005 and drawn on defendant M&T, in the amount of $5,000.00. The check was returned uncollected because the account had been closed.

101.    Upon information and belief, Plaintiff Brian Marchese deposited the following amounts with Barry/Leverage on or about the following dates:

        12/28/07 - $ 50,000
        1/22/08 -  $ 632,748
        4/09/08 -  $ 5,000
        4/29/08 -  $ 5,000
                   $ 692,748

102.    Upon information and belief, Plaintiff Brian Marchese made no withdrawals and he has been damaged in the amount of $692,748.00, plus interest thereon and the costs and disbursements of this action.

103.    Upon information and belief, Plaintiffs Marika Ohryn, Peter Ohryn, Lidia Ohryn and the Ohryn Family Trust (the "Ohryn Plaintiffs") made deposits with Barry/Leverage commencing in or about May 1993 into the following Accounts:

| Account No. | Account Owner |
| --- | --- |
| 5-131-93 | Peter Ohryn |
| 10-061-95 | Lidia Ohryn, Peter Ohryn, Marika Ohryn |
| 11-091-96 | Marika Ohryn and Lidia Ohryn |
| 8-052-04 | Peter Ohryn |
| 8-151-06EX | Ohryn Family Trust |
| 7-021-07B | Peter Ohryn |
| 1-013-09B | Marika Ohryn |
| 2-061-09B | Lidia Ohryn, Peter Ohryn, Marika Ohryn |

104.    Upon information and belief, The Ohryn Plaintiffs deposited the aggregate amount of $1,730,259.45 with Barry/Leverage between May 1993 and February 2009.

105.    Upon information and belief, for the period from 2002 through 2008, the Ohryn Plaintiffs withdrew the total amount of $81,096.27 from their deposits with Barry/Leverage.

- 19 -

106.    Upon information and belief, The Ohryn Plaintiffs have been damaged in the amount of $1,649, 163.18, plus interest thereon and the costs and disbursements of this action.

107.    Upon information and belief, Plaintiffs Irene Rudis and Joseph Rudis made the following deposits with Barry/Leverage on or about the following dates:

```
6/2/95 - $ 5,000
8/14/97 - 2,100
9/19/97 - 3,000
3/23/98-$ 54,600
9/29/98-$ 2,000
313105 - $ 50,000
314105 - $ 50,000
913105 - $ 59,000
919105 - $ 59,000
1/12/06-$100,000
4/10/07-$ 77,800
        $462,500
```

108.    Upon information and belief, Plaintiffs Irene Rudis and Joseph Rudis withdrew the total amount of $12,904 and they have been damaged in the amount of $449,596, plus interest thereon and the costs and disbursements of this action.

109.    Upon information and belief, Plaintiff Lois Sarli-Krebs made the following deposits with Barry/Leverage on or about the following dates:

```
4/22/04 -$ 25,000
6/3/04 - $ 5,000
10/12/04 -$ 46,117.10
11/1/04 -$ 5,000
12/22/04- $150,000
12/12/05- $ 5,900
1/6/06 - $ 5,000
1/9/06 - $ 25,000
1/17/06 -$ 20,000
1/23/06 -$100,000
2/3/06 - $ 50,000
4/25/06 - $ 5,000
5/8/06 - $ 5,000
5/14/06 - $ 8,000
5/22/06 - $ 8,000
```

```
5/27/06 - $ 8,000
7/1/06 - $ 2,000
7/20/06 - $ 9,000
12/27/06 -$ 5,000
2/2/07 - $ 3,000
3/3/08 - $ 10,000
3/3/08 - $ 5,000
5/10/08 -$ 10,000
9/10/08 -$ 10,000
12/30/08 -$ 4,000
        $529,017.10
```

110.    Upon information and belief, Plaintiff Lois Sarli-Krebs made no withdrawals and she has been damaged in the amount of $529,017.10, plus interest thereon and the costs and disbursements of this action.

111.    Upon information and belief, Plaintiff Myron Sech deposited $7,000.00 Barry/Leverage on or about August 20, 2003 and made a total of $2,000.00 in withdrawals between that time and September 30, 3007.  He has been damaged in the amount of $5,000.00, plus interest thereon and the costs and disbursements of this action.

112.    Upon information and belief, Plaintiff Lisa Caprara Sech made the following deposits with Barry/Leverage on or about the following dates:

```
7/18/03 – $ 50,000
2/16/04 – $ 47,000
4/21/05 – $ 2,000
7/19/06 – $ 10,000
4/11/07 – $393,887.18
        $502,887.18
```

113.    Upon information and belief, between September 20, 2003 and June 9, 2008, Plaintiff Lisa Caprara-Sech made withdrawals in the total amount of $31,851.71 and she has been damaged in the amount of $471,035.47, plus interest thereon and the costs and disbursements of this action.

114.    Upon information and belief, Plaintiff Lisa Caprara-Sech received a check

from Barry/Leverage, drawn on defendant TD, on or about June 30, 2008, in the amount of $5,370.00, that was returned for insufficient funds.

115.    Upon information and belief, Plaintiffs Lisa Caprara-Sech and Myron Sech Made the following deposits with Barry/Leverage on or about the following dates:

> 5/5/06 – $ 1,500
> 10/2/06- $ 300
> 4/6/07 – $ 1,300
> 9/30/07– $ 500
>           $3,600

116.    Upon information and belief, Plaintiffs Lisa Caprara-Sech and Myron Sech made no withdrawals and they have been damaged on the amount of $3,600.00, plus interest thereon and the costs and disbursements of this action.

117.    Upon information and belief, Plaintiff Anthony Sech, by his mother and natural guardian Lisa Caprara-Sech, made the following deposits with Barry/Leverage on or about the following dates:

> 7/18/03 –  $1,250
> 8/5/03 –  $775
> 1/29/04 –  $565
> 2/11/04 –  $150
> 2/10/06 –  $1,000
> 10/2/06 –  $146
> 2/2/07 –  $ 611
> 4/6/07 –  $500
> 4/23/08 –  $540
>           $5,537

118.    Upon information and belief, Plaintiff Anthony Sech made no withdrawals and he has been damaged in the amount of $5,537.00, plus interest thereon and the costs and disbursements of this action.

119.    Upon information and belief, Plaintiff Frederick Tarrazi made the following

- 22 -

deposits with Barry/Leverage on or about the following dates:

> 7/31/03-$ 6,000
> 9/10/03-$ 4,000
> 10/5/04-$10,000
> 8/14/05-$ 5,000
> 5/2/05 - $15,000
> 12/18/07-$50,000
> $90,000

120.    Upon information and belief, Plaintiff Frederick Tarrazi made no withdrawals and he has been damaged in the amount of $90,000.00, plus interest thereon and the costs and disbursements of this action.

121.    Upon information and belief, Plaintiff Gregory Tarrazi made the following deposits with Barry/Leverage on or about the following dates:

> 2/5/98 -$ 4,000
> 4/24/01- $ 25,400
> 9/31/01 -$ 29,200
> 1/29/03 -$5,000
> 3/31/03 -$5,000
> 614103 -$5,000
> 3/22/04- $1,600
> 6/13/05 -$5,000
> 9/30/07 -$100,000
> $180,200

122.    Upon information and belief, Plaintiff Gregory Tarrazi made withdraws in the total amount of $27,000.00 between September 10, 2003 and December 18, 2007 and he has been damaged in the amount of $153,200.00, plus interest thereon and the costs and disbursements of this action.

123.    Upon information and belief, Plaintiffs George G. Tarrazi and Kathleen Tarrazi made the following deposits with Barry/Leverage on or about the following dates:

> 8/10/95 -$ 5,000
> 2/1/96 -$ 10,000
> 3/11/97 -$ 5,000

```
4/11/97 -$ 3,000
5/8/97 -$ 2,000
8/6/97 -$ 10,000
8/11/97 -$ 7,500
2/5/98 -$ 500
3/2/98 -$ 2,000
3/4/98 -$ 500
4/6/98 -$ 500
5/7/98 -$ 500
6/5/98 -$ 500
7/6/98 -$ 500
8/5/98 -$ 500
9/8/98 -$ 500
10/8/98 - $ 500
11/6/98 - $ 500
12/4/98 - $ 500
1/6/99 - $ 500
2/4/99 -$ 500
3/4/99 - $500
4/6/99 - $ 500
1/10/00 - $1000
2/4/00 -$1,000
3/3/00 - $1,000
11/13/00 -$ 100
11/8/01 - $ 7,000
11/19/01 -$ 7,000
12/5/01 - $ 7,000
1/18/02 - $ 5,000
6/10/02 - $ 7,000
6/19/02 - $ 7,000
6/26/02 - $ 7,000
7/3/02 -  $ 7,000
7/17/02 - $ 7,000
7/31/02 - $ 7,000
2/18/03 - $ 7,500
5/12/03 - $ 7,500
5/21/04 - $ 5,000
8/25/04 - $ 5,000
11/12/04 -$ 5,000
1/10/05 - $ 5,000
1/12/07 - $ 1,000
7/23/07 - $ 50,000
8/16/07 - $ 50,000
12/10/07 -$ 15,000
          $274,100
```

- 24 -

124. Upon information and belief, Plaintiffs George Tarrazi and Kathleen Tarrazi made withdrawals in the total amount of $32,500.00 for the period from September 14, 1996 through November 24, 2003 and have been damaged in the amount of $241,600.00, plus interest thereon and the costs and disbursements of this action.

### AS AND FOR A FIRST CAUSE OF ACTION

#### Knowing Participation In a Breach of Trust

125. Plaintiffs repeat and reallege the allegations contained in Paragraphs "1" through "124" as though fully set forth.

126. In purporting to act as an investment advisor, Barry/Leverage had a fiduciary duty to Barry/Leverage customers. Barry/Leverage was in a position of superior knowledge and expertise to Barry/Leverage customers, who reposed their trust and confidence in Barry/Leverage. This created a relationship of high trust and confidence whereby Barry/Leverage was entrusted with the funds of Barry/Leverage customers deposited in to the Barry/Leverage accounts in each of the defendant's bank.

127. Defendants knew that Barry/Leverage was purporting to operate an investment advisory business or, at a minimum, were purporting to operate as an investment advisor with authority over discretionary accounts and in that capacity was using each of the Barry/Leverage accounts as fiduciary bank accounts.

128. In addition, defendants knew, among other things, that Barry/Leverage was exercising discretion over the customer accounts.

129. Barry/Leverage breached this trust by misappropriating and diverting Barry/Leverage customer funds in each of the bank accounts maintained with defendants.

- 25 -

130.   Each of the defendants knew that Barry/Leverage was breaching their fiduciary duties by misappropriating and diverting the customer funds in each of the bank accounts. At a Minimum, each defendant knew of suspicious transactions in the Barry/Leverage account that would have led a reasonably prudent person to suspect that army/Leverage were misappropriating and diverting funds of Barry/Leverage business customers and each of the defendants failed to inquire whether Barry/Leverage were misappropriating and diverting those funds. Reasonable inquiry would have revealed that the only plausible explanation for the suspicious transactions was that Barry/Leverage were misappropriating and diverting the customer funds in breach of their fiduciary duties.

131.   Each of the defendants knew that the transactions taking place in each of Barry/Leverage accounts did not coincide with any legitimate enterprise, and thus could only plausibly be explained by fraud.

132.   Upon information and belief, after performing minimal due diligence on Barry/Leverage and the Barry/Leverage accounts, each of the defendants knew that Barry/Leverage was engaging in fraud, or consciously avoided such knowledge. Defendants knew, among other things, that Barry/Leverage's returns were "too good to be true" and could not be reconciled with market conditions.

133.   Despite this knowledge, each of the defendants moved funds in and out of the Barry/Leverage accounts at Barry/Leverage's behest and allowed Barry/Leverage customer funds to be used to make payments to Barry, to allow Barry to purchase speculative real estate, and to fund redemptions from other investors rather than to purchase securities from the Barry/Leverage accounts, in breach of Barry/Leverage's duties as fiduciaries.

- 26 -

134.    Each of the defendants is therefore liable for all funds Barry/Leverage misappropriated from each of the Barry/Leverage accounts after the point at which each defendant knew or should have known that Barry/Leverage was misappropriating those funds.

135.    As a result of each defendant's knowing participation in this breach of trust, Plaintiffs, the customers of Barry/Leverage lost millions of dollars in the aggregate as set forth above.

## AS AND FOR A SECOND CAUSE OF ACTION

### Aiding and Abetting Fraud

136.    Plaintiffs repeat and reallege the allegations contained in Paragraphs "1" through "135" as though fully set forth.

137.    Barry committed a massive fraud through Leverage.  Each of the defendants had actual knowledge of the fraud and lent substantial assistance to Barry/Leverage in committing the fraud.  At a minimum, each of the defendants consciously avoided knowledge of the fraud.

138.    Upon information and belief, each of the defendants suspected a fraud and realized there was a high probability of fraud, but refrained from confirming it, in order to later deny knowledge of the fraud. The actions of each of the defendants proximately caused that fraud that resulted in millions of dollars of damages to customer of Barry/Leverage.

139.    Upon information and belief, each defendant, individually, aided and abetted the fraud.  In addition, all of the defendants operated as a single, indivisible entity.  Therefore, each of the defendants is liable for the actions of the other defendants.

140.    Barry committed a substantial and large fraud through Leverage.  Barry told customers that their money would be invested in securities, that their principal would be safe

- 27 -

and that they would always average a very high rate of return, but instead, Barry stole the money and did not purchase securities as he claimed. The Ponzi scheme has resulted in millions of dollars in losses to customers of Barry/Leverage and, in the aggregate, the Plaintiffs in particular.

141. Upon information and belief, each of the defendants knew, or at least consciously avoided knowledge of the fraud. Each of them knew that transactions in the Barry/Leverage accounts did not coincide with any legitimate enterprise thus could only be plausibly explained by fraud.

142. Upon information and belief, each of the defendants was aware of highly suspicious activity in the Barry/Leverage accounts, including, large repetitive transactions, up and down spikes in the value and volume of transactions, the regular use of hand-written checks for large amounts of dollars and a huge amount of bounced checks over a short period of time.

143. Upon information and belief, after performing minimal due diligence on Barry/Leverage and the Barry/Leverage accounts, each of the defendants knew that Barry/Leverage was engaging in fraud, or consciously avoided such knowledge. Defendants knew, among other things, that Barry/Leverage's returns were "too good to be true" and could not be reconciled with market conditions.

144. Each of the defendants knew Barry was a fraud. At a minimum, each of the defendants was repeatedly faced with evidence that there was a high probability of fraud and made a conscious decision not to confirm that fact.

145. Each of the defendants substantially assisted Barry through Leverage in committing fraud by, among other things, moving funds in and out of the Barry/Leverage accounts at Barry/Leverage's behest, allowing Barry/Leverage customer funds to be used to

make payments to Barry, allowing Barry to purchase speculative real estate, and to fund redemptions from other investors rather than to purchase securities from the Barry/Leverage accounts.

146.    Each of the defendant's assistance was a substantial factor in bring about and a proximate cause of the fraud. But for each of the defendant's assistance, Barry/Leverage would not have been able to continue to operate the Ponzi scheme for over three decades.

147.    As a result of each defendant's aiding and abetting Barry/Leverage's fraud, Plaintiffs, the customers of Barry/Leverage lost millions of dollars in the aggregate as set forth above.

## AS AND FOR A THIRD CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty

148.    Plaintiffs repeat and reallege the allegations contained in Paragraphs "1" through "147" as though fully set forth.

149.    Barry/Leverage owed a fiduciary duty to Barry/Leverage customers. Barry/Leverage breached that fiduciary duty by perpetrating a massive Ponzi scheme and stealing millions of dollars from Barry/Leverage customers.  Each of the defendants knowingly participated in the breach, causing harm to customers of Barry/Leverage. At a minimum, each of the defendants consciously avoided knowledge of the breach.

150.    Upon information and belief, each of the defendants suspected Barry/Leverage were breaching a fiduciary duty and realized there was a high probability that Barry/Leverage were breaching a fiduciary duty, but refrained from confirming it, in order to later deny knowledge of the breach.

151.    Upon information and belief, each defendant, individually, aided and abetted the breach of fiduciary duty by Barry/Leverage. In addition, all of the defendants operated as a single, indivisible entity. Therefore, each of the defendants is liable for the actions of the other defendants.

152.    Barry/Leverage were in a fiduciary relationship with Barry/Leverage customers and they were in a superior position over those customers, which required those customers to repose trust and confidence in Barry/Leverage. In addition, pursuant to various agreements with customers, Barry/Leverage agreed to take customers' money and invest it in securities. Instead, Barry/Leverage took their money and used it to benefit themselves and redeem investments so that the ponzi scheme could continue.

153.    Upon information and belief, each of the defendants knew that Barry/Leverage had a fiduciary duty to their customers and that Barry/Leverage breached that duty. Each of the defendants was aware that Barry/Leverage purported to be an investment advisor who would invest customers' funds in various securities.

154.    Each of the defendants also knew, or at least consciously avoided knowledge that Barry/Leverage breached that fiduciary duty by engaging in fraud. Each of the defendants knew that the transactions taking place in each of the Barry/Leverage accounts did not coincide with any legitimate enterprise and could only be plausibly explained by fraud.

155.    Upon information and belief, each of the defendants was aware of highly suspicious activity in the Barry/Leverage accounts, including, large repetitive transactions, up and down spikes in the value and volume of transactions, the regular use of hand-written checks for large amounts of dollars and a huge amount of bounced checks over a short period of time.

156.     Upon information and belief, after performing minimal due diligence on Barry/Leverage and the Barry/Leverage accounts, each of the defendants knew that Barry/Leverage was engaging in fraud, or consciously avoided such knowledge.  Defendants knew, among other things, that Barry/Leverage's returns were "too good to be true" and could not be reconciled with market conditions.

157.     Each of the defendants knew Barry through Leverage was breaching a fiduciary duty. At a minimum, each of the defendants was repeatedly faced with evidence that there was a high probability of breach of fiduciary duty and made a conscious decision not to confirm that fact.

158.     Each of the defendants substantially assisted Barry through Leverage in committing fraud by, among other things, moving funds in and out of the Barry/Leverage accounts at Barry/Leverage's behest, allowing Barry/Leverage customer funds to be used to make payments to Barry, allowing Barry to purchase speculative real estate, and to fund redemptions from other investors rather than to purchase securities from the Barry/Leverage accounts.

159.     Each of the defendants participated in and provided substantial assistance to Barry/Leverage's breach of fiduciary duty. Each defendant's assistance was a probable cause of the breach.  Without each of the defendant's assistance, Barry/Leverage would not have been able to continue to operate the Ponzi scheme for over three decades.

160.     As a result of each defendant's aiding and abetting Barry/Leverage's breach of fiduciary duty, Plaintiffs, the customers of Barry/Leverage lost millions of dollars in the aggregate as set forth above.

## AS AND FOR A FOURTH CAUSE OF ACTION

### Aiding and Abetting Conversion

161.    Plaintiffs repeat and reallege the allegations contained in Paragraphs "l" through "160" as though fully set forth.

162.    Through the purported investment advisor business, Barry/Leverage converted millions of dollars of customers' property.

163.    Barry/Leverage customers have a legal right and interest in the millions of dollars personally invested with Barry/Leverage.  Barry/Leverage exercised unauthorized dominion and control over those dollars in derogations of their customers' rights by failing to invest the funds in securities.  Instead, Barry/Leverage used the customers' funds to make payments to themselves, purchase speculative real property and to fund redemption s of other investors. Barry/Leverage's unauthorized use of customers' finds resulted in the wrongful conversion of the customers' specifically identifiable funds.

164.    Upon information and belief, each of the defendants had actual knowledge of the conversion and lent substantial assistance to Barry/Leverage in converting those monies. At a minimum, each of the defendants consciously avoided knowledge of the conversion.

165.    Upon information and belief, each of the defendants suspected, and even realized there was a high probability that Barry/Leverage were converting customers' money, but refrained from confirming their suspicions in order to later deny knowledge of the conversion.  Each of the defendant's actions proximately caused the conversion that resulted in millions of dollars of damages to customers of Barry/Leverage.

166.    Upon information and belief, each of the defendants knew, or at least consciously avoided knowing that Barry/Leverage did not purchase securities but instead stole

- 32 -

customers' money. Each of the defendants knew that the inexplicable transactions taking place in the Barry/Leverage accounts did not coincide with any legitimate securities investment and thus could only be explained by fraud.

167.   Upon information and belief, each of the defendants was aware of highly suspicious activity in the Barry/Leverage accounts, including, large repetitive transactions, up and down spikes in the value and volume of transactions, the regular use of hand-written checks for large amounts of dollars and a huge amount of bounced checks over a short period of time.

168.   Upon information and belief, after performing minimal due diligence on Barry/Leverage and the Barry/Leverage accounts, each of the defendants knew that Barry/Leverage was engaging in conversion, or consciously avoided such knowledge. Defendants knew, among other things, that Barry/Leverage's returns were "too good to be true" and could not be reconciled with market conditions.

169.   Each of the defendants knew Barry through Leverage was converting customers' funds. At a minimum, each of the defendants was repeatedly faced with evidence that there was a high probability of conversion of customers' funds and made a conscious decision not to confirm that fact.

170.   Each of the defendants substantially assisted Barry through Leverage in converting customers' funds by among other things, moving funds in and out of the Barry/Leverage accounts at Barry/Leverage's behest, allowing Barry/Leverage customer funds to be used to make payments to Barry, allowing Barry to purchase speculative real estate, and to fund redemptions from other investors rather than to purchase securities from the Barry/Leverage accounts.

171.    Each of the defendants participated in and provided substantial assistance to Barry/Leverage's conversion of customers' funds. Each defendant's assistance was a probable cause of the conversion. Without each of the defendant's assistance, Barry/Leverage would not have been able to continue to operate the Ponzi scheme for over three decades.

172.    As a result of each defendant's aiding and abetting Barry/Leverage's conversion of customers' funds, Plaintiffs, the customers of Barry/Leverage, lost millions of dollars in the aggregate as set forth above.

## AS AND FOR A FIFTH CAUSE OF ACTION

### Unjust Enrichment

173.    Plaintiffs repeat and reallege the allegations contained in Paragraphs "1" through "172" as though fully set forth.

174.    Upon information and belief, each of the defendants benefitted through its receipt of funds that were the property of Barry/Leverage customers, benefits that each defendant acquired only as a result of perpetuating and participating in the Barry/Leverage Ponzi scheme.

175.    Each of the defendants benefitted by receiving customers' funds by receiving deposits of those funds into the Barry/Leverage accounts and using the balances in each account for their own benefits  so long as each account was open. Each of the defendants also received customers' funds when Barry/Leverage checks were dishonored in the form of fees charged for returned checks.

176.    Each of the defendants earned these benefits at the expense of Plaintiffs and cannot justly retain them.  Upon information and belief, faced with the prospect of losing fees

and profits, each of the defendants chose to ignore compelling evidence of Barry/Leverage's breach of fiduciary duty, fraud and conversion as aforesaid.

177.    Each of the defendants helped perpetuate Barry/Leverage's misconduct as aforesaid by ignoring evidence of such misconduct and continuing to use the Plaintiffs' funds in each Barry/Leverage account for its own enrichment.

178.    Equity and good conscience require full restitution of the monies received by each defendant, directly and indirectly from Barry/Leverage. This includes not only Plaintiff s funds each defendant received directly from Barry/Leverage, but also any profits made from each defendant's use of this money.

## AS AND FOR A SIXTH CAUSE OF ACTION

### Fraud on the Regulator

179.    Plaintiffs repeat and reallege the allegations contained in Paragraphs "1" through "178" as though fully set forth.

180.    Upon information and belief, at all times relevant herein, the individual defendants have been regulated by federal and New York state agencies.

181.    Pursuant to the regulations of the various agencies, each of the defendants was required to report to regulators any suspicious activity in the accounts of each bank's customers. Each defendant was also required to implement policies and procedures for identifying potentially illegal activity.

182.    Upon information and belief, as detailed above, each of the defendants omitted and misrepresented facts to both federal and state regulators. Each of the defendants defrauded these regulators to the detriment of Plaintiffs.

183.     Throughout their relationships with Barry/Leverage, each of the defendants had access to a wealth of information as aforesaid about Barry/Leverage's illegal activities. Among other things, such information revealed inconsistencies between Barry/Leverage's purported business, activity in each of the Barry/Leverage accounts and indicated that Barry/Leverage were engaged in illegal activities.

184.     Each of the defendants is required under the bank Secrecy Act, the Patriot Act, and was required under New York laws and regulations, to file reports with appropriate regulators when each discovers suspicious activity by any of its customers. Such activity includes, inter alia, transactions where the bank has a substantial basis for believing a criminal violation is occurring, transactions involving potential money laundering and transactions that have no business or apparent lawful purpose or are not the sort in which the particular customer would normally be engaging. As alleged in detail above, there were numerous  suspicious transactions in each of the Barry/Leverage accounts which should have triggered investigations and reports to regulators. Nor did the Barry/Leverage accounts serve a legitimate business purpose as money in those accounts did not go to buy and sell securities. The only plausible explanation was that Barry/Leverage were engaging in fraud or other illicit activity.

185.     Upon information and belief, none of the defendants made reports concerning suspicious activities in the Barry/Leverage accounts. Although there was no legitimate business purpose for activity in the accounts, the accounts were never closed, which would have been consistent with reports to regulators for such egregious conduct.

186.     Each of the defendants is required under the Bank Secrecy Act, the patriot Act, and was required under New York laws and regulations, to maintain rigorous anti-money-laundering policies and procedures. If each of the defendants had such policies and procedures

and executed them thoroughly and diligently, the regulators would have had information that would have led to the uncovering of the Ponzi scheme, because the only plausible explanation was that Barry/Leverage were engaging in illegal activities.

187.    Based on the information uniquely available to each of the defendants, each defendant knew that the only plausible explanation regarding the business engaged in through Barry/Leverage was illegal activities. Each of the defendants therefore knowingly failed to communicate these facts to regulators, despite each one's obligation to do so.

188.    In light of the above information, each defendant's failure to fully and accurately report to regulators was reckless and evidence of conscious misbehavior on the part of each defendant. Each defendant ignored its duty to monitor each Barry/Leverage account and each one's internal policies and procedures aimed at detecting the numerous red flags surrounding Barry/Leverage's operations.

189.    Each defendant's failure to fully and accurately report allowed each one to maintain a profitable relationship with Barry/Leverage and continue to earn more revenues at Plaintiffs' expense.

190.    Each of the defendant's reputation in the banking and financial communities lent Barry/Leverage's operations legitimacy and cover that was reasonably relied upon by Barry/Leverage customers, and Plaintiffs in particular, who transferred money to Barry/Leverage.

191.    Each of the defendants intended for Barry/Leverage customers to rely upon each defendant's commitment to compliance when they were transacting business with each defendant through deposits into the Barry/Leverage accounts.

192.    Plaintiffs reasonably relied on each defendant to adequately monitor and fully and accurately report on Barry/Leverage. Plaintiffs reasonably relied on each defendant's representations and reputations when they chose to continue giving money to Barry/Leverage. If each defendant had not defrauded federal and state regulators, the holes in each defendant's compliance programs and the fraudulent activity in the Barry/Leverage bank accounts would have been exposed to Plaintiffs.

193.    Likewise, each defendant proximately caused the loss to Plaintiffs and other customers of Barry/Leverage.

194.    As a result of each of the defendant's fraud upon federal and state regulators, Plaintiffs, in the aggregate, lost millions of dollars. At a minimum, the actions of each defendant resulted in an aggregate loss Plaintiffs of at least $11.1 million.

### AS AND FOR A SEVENTH CAUSE OF ACTION

#### Common Law Negligence

195.    Plaintiffs repeat and reallege the allegations contained in Paragraphs "1" through "194" as though fully set forth.

196.    Each of the defendants had a duty to:

a.      know its customer;

b.      monitor its customer's account activity;

c.      know what business its customer Barry/Leverage was operating;

d.      investigate the Barry/Leverage account activity which was inconsistent with any legitimate business purpose;

e.      investigate suspicious activity in the Barry/Leverage accounts; and

f.      take action.

- 38 -

197.    Each of the defendants breached those duties and such breaches were a substantial cause in bringing about injury to the Plaintiffs.

198.    The injuries to each of the Plaintiffs was brought about as the result of the gross negligence, negligence, carelessness and recklessness of each of the defendants as more particularly detailed above and by example, in allowing Barry/Leverage to breach their fiduciary obligations to Plaintiffs, convert Plaintiffs' funds, and commit a fraud on the Plaintiffs.

199.    As the result of the gross negligence, negligence, carelessness and recklessness of each of the defendants, Plaintiffs have been damaged in amounts to be determined on the trial of this action, but in the aggregate amount of at least $ 11.1 Million and punitive damages in the amount of $250,000,00.00.

WHEREFORE, Plaintiffs respectfully demand judgment as follows:

a.    on their First Cause of Action, compensatory damages in amounts to be proven upon the trial of this action, but in the aggregate amount of at least $11.1 million and exemplary and/or punitive damages in an amount to be determined upon the trial of this action;

b.    on their Second Cause of Action, compensatory damages in amounts to be proven upon the trial of this action, but in the aggregate amount of at least $11.1 million and exemplary and/or punitive damages in an amount to be determined upon the trial of this action;

c.    on their Third Cause of Action, compensatory damages in amounts to be proven upon the trial of this action, but in the aggregate amount of at least $11.1 million and exemplary and/or punitive damages in an amount to be determined upon the trial of this action;

d.    on their Fourth Cause of Action, compensatory damages in amounts to be proven upon the trial of this action, but in the aggregate amount of at least $11.1 million and exemplary and/or punitive damages in an amount to be determined upon the trial of this action;

e.     on their Fifth Cause of Action, compensatory damages in amounts to be proven upon the trial of this action, but in the aggregate amount of at least $11.1 million and exemplary and/or punitive damages in an amount to be determined upon the trial of this action, and disgorgement of all profits made by each defendant on Plaintiff s funds;

f.     on their Sixth Cause of Action, compensatory damages in amounts to be proven upon the trial of this action, but in the aggregate amount of at least $11.1 million and exemplary and/or punitive damages in an amount to be determined upon the trial of this action;

g.     on their Seventh Cause of Action, compensatory damages in amounts to be proven upon the trial of this action, but in the aggregate amount of at least $11.1 million and exemplary and/or punitive damages in the amount of $25,000,000.00;

h.     prejudgment interest pursuant to CPLR §5001 and interest pursuant to CPLR §5002 and §5003;

i.     the attorney's fees, costs and disbursements of this action; and

j.     such other and further relief as may be just and proper.

Dated: New York, New York
           June 2, 2015

KAHN GORDON TIMKO & RODRIQUES, P.C.

By: Nicholas I. Timko
*Attorneys for Plaintiff*
20 Vesey Street - Suite 300
New York, NY  10007
(212) 233-2040
(212) 732-4666  (Fax)
nitimko@kgtrpc.com

- 40 -

## ATTORNEYS VERIFICATION

**NICHOLAS I. TIMKO**, an attorney duly admitted to practice law before the Courts of New York State, hereby affirms under the penalties of perjury pursuant to CPLR 2106:

I am a member of the firm of KAHN, GORDON, TIMKO & RODRIQUES, P.C., attorneys for the plaintiffs herein.

I submit the following statement upon information and belief, based upon an inspection of the records maintained by this office, which records I believe to be true.

That I have read the foregoing **SUMMONS and VERIFIED COMPLAINT**, and believe it to be true based on information available or maintained by this firm. I make this verification because the plaintiff either resides in a county other than that wherein deponent currently maintains his office or plaintiff is currently unavailable to provide said verification in a timely manner.

Dated: New York, New York
June 2, 2015

NICHOLAS I. TIMKO

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------------------------------x
ALEXANDER MARCHAK, HOLLY MARCHAK,            E-Filing Case
ALEX MARCHAK,
CONNIE BOCCIA, FRANK BOCCIA,
MARGOT BOCCIA, BRIAN MARCHESE,              INDEX NO.
LIDIA OHRYN, MARIKA OHRYN, PETER OHRYN,
OHRYN FAMILY TRUST, JOSEPH RUDIS,
IRENE RUDIS, LOIS SARLI-KREBS,              **SUMMONS and**
LISA CAPRARA SECH, ANTHONY SECH,            **VERIFIED COMPLAINT**
MYRON SECH, LEONARD MANDATO,
EDWARD MAHONEY, TARA MAHONEY,
GREGORY TARAZZI, FREDERICK TARAZZI,
GEORGE TARAZZI, KATHLEEN TARAZZI,
ANDREA CHIARAPPA, YOLANDA CHIARAPPA,
DOREEN DALY, FRANCIS DALY, LORRAINE DALY,

*Plaintiffs,*

-against-

JPMORGAN CHASE & CO.,
JPMORGAN CHASE BANK, N.A.,
M&T BANK CORPORATION,
HSBC NORTH AMERICA INC., d/b/a
HSBC BANK USA, N.A.,
and TD BANK, N.A.,
AS SUCCESSOR IN INTEREST TO COMMERCE BANK,

*Defendants.*

-------------------------------------------------------------------------x

Kahn Gordon Timko & Rodriques, P.C.
*Attorneys for Plaintiffs*
20 Vesey Street – Suite 300
New York, New York 10007
(212) 233-2040